2025 IL App (1st) 230602-U

No. 1-23-0602

First Division
June 23, 2025

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 04 CR 00283 |
| v. | ) ) | |
| QUENTIN COX, | ) ) | Honorable Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*:  Defendant's 42-year sentence is affirmed where the sentence did not violate the United States or Illinois Constitutions, the trial court did not err in its consideration of the requisite factors before imposing the sentence, and the trial court did not improperly increase defendant's sentence.

¶ 2    Following a jury trial, defendant-appellant Quentin Cox was found guilty of first degree murder, an offense committed when defendant was 16 years old. Defendant was sentenced to 65 years in prison, which included a mandatory 25-year firearm enhancement. During successive

postconviction proceedings, the State agreed that defendant's sentence violated *Miller v. Alabama*, 567 U.S. 460 (2012), and a new sentencing hearing was ordered. On December 16, 2022, following a hearing, the trial court declined to impose the firearm enhancement and resentenced defendant to 42 years' imprisonment. On March 16, 2023, the court denied defendant's motion to reconsider the new sentence. Defendant appeals therefrom, arguing that: (1) his 42-year sentence violates the United States Constitution and the Illinois Constitution; (2) the court erred in its consideration of the juvenile sentencing factors and mitigating evidence and imposed an excessive sentence; and (3) the court improperly increased his base sentence from 40 years to 42 years. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On November 30, 2003, defendant, who was born on July 11, 1987, was arrested and charged with first degree murder for the October 3, 2003, shooting death of 17-year-old James Davis. The following evidence was presented at defendant's jury trial.

¶ 5     On the evening of October 3, 2023, brothers, Jeremy Jones and Clifford Jones, along with their cousin, Davis, left their grandmother's house at 99th Street and Charles Street and walked to 99th and Malta Street to pick up their friend, Lance Flowers. On their way, Jeremy and Clifford observed a man wearing a jacket and a skullcap walking towards them. After Lance joined them, they observed the same man again, who then pulled out a gun, waved it in the air, and pointed it at their group. The group fled, and soon after, Jeremy heard gunshots. When Jeremy reached a nearby alley, he turned around and saw Davis fall to the ground and the man with the gun running in the opposite direction. Clifford ran into an alley, heard two shots, and continued running to his grandmother's house. He went back to the area soon after, where he observed Davis being put into an ambulance.

¶ 6 At the same time, Dominique Bullitt, Charles Lewis, and Kelly Farmer, were standing at a bus stop at 99th and Beverly Street. Bullitt and Lewis observed a man approaching them with a gun and the group fled. While running away, Bullitt encountered Davis and his group, who also fled. Bullitt heard three gunshots, ran into an alley, and waited until the gunshots stopped. Bullitt and Lewis returned to 99th and observed Davis on the ground.

¶ 7 On the night of the shooting, Clifford described the shooter as 17 or 18 years old, 5 feet 7 inches, 150 pounds, and dark-skinned, wearing a black jacket, black hat, black pants, and white shirt. Jeremy described the shooter as a black, dark-skinned male between 17 and 18 years old, 155 pounds, wearing a quilted jacket, a white shirt, black pants, and a black skullcap with a red emblem. The morning after the shooting, the police separately showed Clifford and Jeremy a photo array but neither identified the shooter from the array. Weeks later, the police showed Clifford another photo array containing six pictures and he selected one individual as "most similar" to the shooter but did not affirmatively identify this person as the shooter. On December 1, 2003, at a police station, Clifford, Jeremy, Bullitt, and Lewis separately viewed a lineup and each identified defendant as the shooter. On December 18, 2003, before a grand jury, Bullitt and Lewis testified that defendant was the shooter, although at trial, both recanted that testimony, claiming that they did not see the shooter's face and that they identified defendant in the lineup based on the other witnesses' identification of defendant as number 4.

¶ 8 The jury found defendant guilty of first degree murder and that he personally discharged the firearm causing the victim's death. Defendant was sentenced to an aggregate prison term of 65 years, consisting of 40 years for murder and a 25-year enhancement for personally discharging the weapon that caused the victim's death.

¶ 9    On direct appeal, defendant raised challenges to the sufficiency of the evidence, claims of improper hearsay evidence, prosecutorial misconduct, and sentencing errors. This court affirmed defendant's conviction and sentence. *People v. Cox*, 377 Ill. App. 3d 690 (2007).

¶ 10    On August 25, 2008, defendant filed a *pro se* initial postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1, *et seq.* (West 2008)), alleging ineffective assistance of trial and appellate counsel. On October 31, 2008, the petition was summarily dismissed, and this court affirmed the dismissal in *People v. Cox*, No. 1-08-3582 (2011).

¶ 11    On January 7, 2009, defendant filed a *pro se* motion for leave to file a successive postconviction petition. The petition was given a hearing date of January 14, 2009, but the docket notes from that day show that the petition was taken off the call, and no further action on the motion appears in the record.

¶ 12    On August 15, 2017, defendant filed a second *pro se* motion for leave to file a successive postconviction petition, claiming that his sentence was unconstitutional under *Miller*. On September 21, 2017, the court entered an order advancing defendant's successive petition to second stage proceedings and appointed counsel for defendant. Counsel filed an amended petition on defendant's behalf, and, on May 13, 2021, the State orally advised the court that it agreed that defendant's petition should be granted, and he should receive a new sentencing hearing. On August 9, 2021, the trial court vacated defendant's 65-year sentence and remanded defendant to the Cook County jail.

¶ 13    On March 24, 2022, a presentence investigation report (PSI) was filed with the court. Therein, defendant admitted to being a member of the Black P Stones from 2005 to 2008 but has not had any gang affiliation since then. Defendant also reported that he had a "decent home environment, but his parents suffered from drug addictions" and "he endured trauma as an

adolescent from seeing people being beat in various ways with various weapons." According to defendant's version of the offense, "a group of people were mouthing off to him and he was triggered at a certain comment before he committed the offense." To the probation officer who completed the report, defendant stated that he was "trying to prove he was something he wasn't" and he was "regretful about what happened and it was done when he was not considering the consequences or risks of his actions."

¶ 14    On December 13, 2022, defendant's resentencing hearing was held. In aggravation, the State presented the impact statement of the victim's mother, Reva McClain. The defense offered the following in mitigation: a mitigation report from Amanda Myers, a licensed social worker; a report from Dr. James Garbarino, an expert in developmental psychology; Salvador Godinez's testimony; and letters of support from defendant's family and friends.

¶ 15    In the mitigation report, dated August 8, 2022, Myers reported that defendant was born prematurely and tested positive for cocaine and he was in the hospital often when he was young due to heart issues. Following interviews with family members and defendant, Myers's reported that there was a history of domestic violence between defendant's parents; his parents were addicted to heroin and cocaine; his parents would allow strangers in to their home often and would take the children to "seedy" places to purchase drugs; defendant's house burned down in a fire when he was nine years old; defendant's family moved often due to poverty; at one point, defendant lived in Minnesota with his aunt and also in a shelter and he did not attend school regularly during his time in Minnesota; defendant's brother sold drugs, which his parents encouraged to support their own habit; and, at one point, many of defendant's male family members were incarcerated. Defendant also reported to Myers that, when he was younger, he observed a group of kids being violently beaten by rival gang members and he was later beaten by

a group of kids himself. When the family moved back to Chicago in 2003, defendant lived with his grandmother and many of his friends were members of the Black P Stones gang. According to defendant, his friends had a "beef" with Bullitt, who was allegedly a Gangster Disciple, and on the night of the offense, Bullitt yelled at defendant to turn his hat straight (due to gang affiliations) and that they should "beat" defendant. Because defendant was scared, he felt that he needed to use a gun he had on his person for protection, but he later understood that it was wrong and he felt "utter remorse."

¶ 16    In his report, Dr. Garbarino explained generally how brain function is compromised in those under the age of 25, and those who experience coherent and supportive social and psychological environments will be able to better manage their emotions and behaviors. He applied the Center for Disease Control's adverse childhood experience (ACE) factors to defendant. Out of ten different negative childhood experiences, six applied to defendant, including emotional abuse, physical abuse, parental separation, domestic violence, substance abuse, and incarcerated family members. Dr. Garbarino stated that defendant's experiences compounded the limitations of adolescent brains and increased his risk for anti-social and self-destructive behavior. In describing the offense to Dr. Garbarino, defendant again stated that the three individuals at the bus stop made threatening statements towards him. When asked about remorse, defendant stated to Dr. Garbarino: "I think about my victim's mother a lot. I always said that if I could get out and apologize to her I would do it in a heartbeat. She lost her son. It's a lot to carry around in my heart." Dr. Garbarino stated that defendant's actions reflected immature impulsiveness due to his brain development, his dysfunctional upbringing, and his exposure to community violence and substance abuse. Dr. Garbarino opined that defendant, at the time of the offense, was "[s]teeped" in a "war zone" mentality of hypervigilance. Finally, Dr. Garbarino pointed out that defendant was approaching

40 years old, which is an age group with the lowest risk for recidivism. We note that Dr. Garbarino recognized that defendant's 2005 PSI differed greatly from his recent mitigation report. Although he admitted that some individuals seeking resentencing may misrepresent their experiences in a negative light to elicit compassion and shorter sentences, he instead opined that it could be attributed to family privacy as well as an adolescent's inability to understand the trauma and abuse they experienced until they reached adulthood.

¶ 17    Salvador Godinez, former executive director of the Illinois Department of Corrections, testified as follows. While incarcerated, defendant had received only one "major" ticket which was for breaking a sprinkler during his first year of incarceration. Otherwise, defendant received six minor tickets during his incarceration and none of them were accompanied by any disciplinary action. Godinez testified that defendant's "aggression level remained low" throughout most of his incarceration. He further testified that defendant did not have an "investigation file" in his records, meaning that defendant never caused any significant problems while incarcerated and had no gang activity or affiliation to be reported. When asked whether there was any programming available during defendant's incarceration, Godinez responded as follows:

"Well, the first answer is yes. There were programs available. The second answer is that they were -- these programs were mostly available to individuals that were short timers and getting ready to be released. Around the year I believe 1999 the department had a shift in direction, policy, and they pulled back a lot of the programs, added more security to the facilities, and in the interim what was lost was a lot of programming. At one time just about everybody was able to get [programming,] but later on *** when they pulled that back[,] only those individuals that were prepared to be released were on top of the list

to get these programs. If you were a long termer, it was hard to get someone into a program."

Regarding defendant, Godinez testified that he is involved in the Second Chance Program and the PACE Program, which helps incarcerated individuals earn their GED.

¶ 18     Based on interviews with defendant in March and August of 2022, Godinez testified that defendant was "very contrite and "very mature" about the offense, and he "took responsibility" for it. Defendant stated to Godinez that "at that time, he was *** a scared man who thought that was the best way to show he was a tough man" and that he "relives" that day "constantly."

¶ 19     Nine letters were provided on defendant's behalf. In particular, his cousin in Minnesota provided a lengthy letter, detailing defendant's childhood and stating that she would provide monetary assistance and help defendant get a job when he is released. Additionally, two of his siblings and another aunt in Chicago stated that defendant could live with them and they would help him get a job.

¶ 20     In allocution, defendant apologized to the victim's family for the pain that he caused and stated that he "had no right to take their son away from them." He stated that, during his incarceration, he has learned "sympathy, remorse, pain and responsibility for [his] immature and thoughtless actions." He apologized to the court, as he has now "learned to live more responsibly" and he hopes "to have a better life for [himself] and become a positive role model for younger inmates." He also thanked the court for the opportunity to show the changes that he has made.

¶ 21     On December 16, 2022, the trial court issued its ruling on resentencing. We provide a detailed summary of the court's oral ruling.

¶ 22     After explaining the history of the case, as well as *Miller* and its progeny, and identifying the *Miller* factors, the court specifically found that, in compliance with *Miller*, the juvenile parole

system offers a meaningful opportunity for release. It also stated that it was not going to impose the discretionary 25-year firearm enhancement.

¶ 23    In coming to its decision, the court stated that it reviewed the PSI, the IDOC records, Myers's mitigation report, Dr. Garbarino's report, and the letters of support from defendant's family members. The court noted that Dr. Garbarino's report seemed "nonspecific" regarding defendant, there were no neurological studies conducted, Dr. Garbarino "talks generally about factors involved in youth activity[,]" and there was nothing regarding a cognitive or intellectual disability. The court ultimately stated that it did not find the report "very persuasive" or "compelling[.]"

¶ 24    As to the factors in aggravation, the court found that defendant caused serious harm where he was the principal shooter and the facts from the trial showed that he chased individuals down a street and one was shot and killed because of defendant's acts. It also found deterrence to be an applicable aggravating factor. Specifically, the court stated that it did not know whether deterrence worked but "a harsh sentence is necessary to deter others" from committing "unprovoked" murders.

¶ 25    The court then addressed each factor set forth in *Miller* and in the juvenile sentencing statute. As to age, the court stated that defendant was "obviously *** a juvenile." However, it did not "see any immaturity here" because "whether you're 12, 13, 16, 18, or 65," it is wrong to "chase somebody down a street and you fire at them" and "you should know that is wrong." The court called the offense "a calculated shooting" where defendant "chas[ed] an individual down the street and [shot] an individual in the back" and he was "acting without any regard for anybody but himself." Further, the court noted that there was no evidence that defendant had any cognitive

limitations or disabilities or that he could not understand the consequences of his own actions. The court concluded that it did not see this to be a mitigating factor.

¶ 26    As to family and home environment, the court pointed out that the PSI at the original sentencing and the report submitted for the resentencing were "inconsistent[.]" According to the court, the initial PSI reflected that defendant had a decent home environment, he "did well in school[,]" his parents were drug addicts but no one else in his family was involved in the criminal justice system, and he had good relationships with his father and siblings. However, the mitigation report showed that defendant had a "very dysfunctional family" and he witnessed ongoing domestic violence between his parents, who were both addicted to drugs. The court characterized this as "a very chaotic upbringing." The court further stated, "I'm not sure exactly how it can be one extreme to the other ***. The defense PSI is much more detailed. I will consider in great form the information presented by the defense expert with regard to that." The court also stated that there does appear to have been "parental neglect," "some physical abuse," and "some childhood trauma, particularly vicarious or secondary trauma watching what was going on in his neighborhood and also watching the contentious relationship with his parents at that time."

¶ 27    As to the degree of participation and role of peer and familial pressure, the court stated that defendant was the "primary actor" and it did not appear "that someone forced him to do this" or "that the family was involved with this[.]" However, the court also "assumed that he had some negative influences being in a gang" and that "he had some negative influences growing up in *** a dysfunctional or chaotic home during his formative years, but there is nothing that indicates this crime itself was motivated by peer pressure or familial pressure."

¶ 28    As to defendant's ability to participate in his defense and engage with police officers and attorneys, the court stated that it did not see any evidence that defendant was "unable to either

intellectually or cognitively be able to deal both with police officers or attorneys in this matter" and there is nothing in the record to show that "he could not participate in his defense."

¶ 29    As to the circumstances of the offense, the court stated that they were "very severe" and "[t]here's nothing in any sentencing statute that tells me I cannot consider aggravating factors such as the facts of the crime." The court continued: "I definitely have to consider [defendant's] age and the attendant circumstances of youth, but again, that does not excuse, it does not condone, and it definitely does not reward someone for having such conscious disregard for the safety of others by chasing them down the street and shooting them."

¶ 30    As to juvenile and criminal history, the court noted that defendant did not have "any reportable cases" in the juvenile or adult system and he did not have any criminal background prior to this offense. The court stated that it would weigh this factor in favor of mitigation.

¶ 31    As to rehabilitation, the court recognized that defendant "has gone through several years in the penitentiary with the lack of any type of serious ticket in this matter" and that defendant "does appear to have people that care about him" and "are willing to take him in, willing to mentor him, willing to help him find jobs and to assimilate into the community." The court specifically stated that it would take defendant's "good family structure" as a "very strong factor in mitigation." The court also stated that it was "a little concerned about the fact that [defendant] didn't really get himself involved in too much programming when he was in the jail" and noted that he was "only now striving to get his GED." The court acknowledged Godinez's testimony that "there were no programs allowed or that the programs were cut back" but stated that "there still were programs there." Ultimately, the court found that defendant "has great potential for rehabilitation."

¶ 32    Finally, the court addressed defendant's statement in allocution. It noted that defendant had filed multiple postconviction petitions containing "self-serving statements" alleging his innocence,

which were "a waste of court resources" and "in direct contrast to what he told this Court and the victim's family during the sentencing hearing." The court thus questioned the sincerity of defendant's remorsefulness and stated that defendant's apology was "very self-serving[,]" "very scripted[,]" and "very contrived to try to meet the matter in mitigation[.]"

¶ 33    The court then stated that it took into consideration "all the matters in aggravation and mitigation[,]" that "[d]efendant was a juvenile at the time of the offense," "the statutory factors for juveniles" and the *Miller* factors, and sentenced defendant to 42 years' imprisonment, stating it was a "midline sentence." A written sentencing order to that effect was entered the same day.

¶ 34    On December 29, 2022, defendant filed a motion to reconsider his sentence. On February 14, 2023, defendant filed an amended motion to reconsider his sentence, arguing *inter alia*, that the court (1) erroneously concluded that the new youthful offender parole statute cured all *de facto* life sentences; (2) improperly added two years to the original underlying 40-year sentence; (3) disregarded Godinez's testimony and relied on its own opinion that programming was available to defendant in IDOC; and (4) improperly considered the attributes of defendant's youth. On March 16, 2023, the court denied defendant's amended motion, finding that its sentence was proper, constitutional, and took into consideration all of the requisite factors.

¶ 35    This appeal followed.

¶ 36                                   II. ANALYSIS

¶ 37    On appeal, defendant argues that: (1) his 42-year sentence violates the United States and Illinois Constitutions as the sentence does not provide a meaningful opportunity for release before defendant spends a *de facto* life term in prison; (2) a new sentencing hearing is necessary because the judge misconstrued the statutory juvenile sentencing factors and disregarded uncontested

mitigating evidence and the 42-year sentence is excessive; and (3) the court improperly added two years to his base sentence.

¶ 38                    A. Violation of United States and Illinois Constitutions

¶ 39    Defendant argues that his 42-year sentence violates the United States and Illinois Constitutions because the trial court expressly stated that defendant had rehabilitative potential and still sentenced him to a *de facto* life sentence that does not provide him, under the Illinois youthful offender parole statute, a "meaningful opportunity for release." The State responds that defendant was not given a *de facto* life sentence as the parole statute provides a meaningful opportunity for release and thus, the protections of *Miller* and its progeny are not implicated and there can be no violation of the United States or Illinois Constitutions. For the following reasons, we agree with the State.

¶ 40    The State contends that defendant failed to preserve the argument that the parole statute does not provide a meaningful opportunity for release where it was not raised in defendant's amended motion to reconsider the sentence. In his reply brief, defendant requests plain error review and asserts, in the alternative, that his counsel was ineffective for failing to raise that issue in the court below. Regardless, the State also argues that "there was no error, plain or otherwise, because abundant and persuasive precedent from this court and the Illinois Supreme Court instructs that the parole statute works to provide 'meaningful opportunity' for release." We agree.

¶ 41    Defendant's challenges under both the United States Constitution and the Illinois Constitution are based on *Miller*. The eighth amendment of the United States Constitution prohibits the imposition of "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). The proportionate penalties clause of the Illinois Constitution requires that "[a]ll penalties *** be

determined both according to the seriousness of the offense and with the object of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In *Miller*, the United States Supreme Court held that the prohibition on cruel or unusual punishments in the eighth amendment forbids mandatory life sentences without the possibility of parole "for those under the age of 18 at the time of their crimes." *Miller*, 567 U.S. at 465, 479. The Illinois Constitution, with its proportionate penalties clause, "goes further than the eighth amendment in offering protection against oppressive penalties and sentences." *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 43. Our review of the constitutionality of defendant's sentence is *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 42    Illinois courts have held that *Miller* also applies to *de facto* life sentences (*People v. Reyes*, 2016 IL 119271, ¶ 9), which is a prison term that exceeds 40 years (*People v. Buffer*, 2019 IL 122327, ¶¶ 40-41). Whether raised under the eighth amendment or the proportionate penalties clause, the threshold inquiry for a juvenile defendant is whether a life sentence, *de facto* or otherwise, was imposed. See *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 68; *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 42. As we explain below, defendant has not satisfied that threshold showing as he has not been sentenced to a *de facto* life sentence.

¶ 43    In 2019, the Illinois General Assembly enacted legislation providing, *inter alia*, parole review for juvenile defendants convicted of first degree murder. 730 ILCS 5/5-4.5-115 (West 2022). The statute provides two opportunities for parole: one after 20 years of incarceration and another 10 years later. *Id.* § 5-4.5-115(b), (m). The United States Supreme Court expressly stated in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), that a *Miller* violation may be remedied "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them[,]" which "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence[.]" Our supreme court

in *Dorsey* cited this portion of the *Montgomery* decision in analogizing the discretionary parole system to the availability of good conduct credit. See *People v. Dorsey*, 2021 IL 123010, ¶¶ 54-56.

¶ 44    In light of *Montgomery* and *Dorsey*, the appellate court has concluded in all but two decisions that the availability of parole for youthful offenders renders *Miller* inapplicable. See, *e.g.*, *People v. Deleon*, 2025 IL App (1st) 211454, ¶ 45; *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 60; *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 43; *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56; *People v. Beck*, 2021 IL App (5th) 200252, ¶ 26; but see *People v. Gates*, 2023 IL App (1st) 211422, ¶¶ 38-49 (finding *de facto* life sentence, despite availability of parole under section 5-4.5-115); *People v. Carrasquillo*, 2023 IL App (1st) 211241, ¶ 51 (finding that the defendant's opportunity for parole was not meaningful and his indeterminate sentence of 200 to 600 years was "the functional equivalent of a life without parole sentence").

¶ 45    After briefing was completed in this case, our supreme court issued its decision in *People v. Spencer*, 2025 IL 130015, ¶ 40, expressly overruling the appellate court decisions in *Gates* and *Carrasquillo*, to the extent that they "can be interpreted to hold that sentences over 40 years are *de facto* life sentences despite the defendant's eligibility for parole[.]" The supreme court agreed with the majority of appellate decisions, holding that there is no *de facto* life sentence where a defendant is eligible for parole after 20 years under section 5-4.5-115. *Id.* Because we are bound by the decisions of the Illinois Supreme Court (*People v. Spahr*, 56 Ill. App. 3d 434, 438 (1978)), we must conclude that defendant here was not subject to a *de facto* life sentence where he is eligible for parole after 20 years under the parole statute.

¶ 46    Additionally, although the *Spencer* court did not specifically address the defendant's arguments as to why our parole system does not provide a meaningful opportunity for release for

youthful offenders, the court's unambiguous holding conveys a rejection of those arguments. In particular, the defendant in *Spencer* asserted in his brief to the supreme court that "Illinois has one of the harshest juvenile parole statutes in the country, the statute instructs the parole board to consider factors in aggravation that should be considered in mitigation as to youthful offenders, and finally, the decision of the administrative parole board is not subject to any review." Defendant sets forth the same arguments in his brief before this court. We see no need to provide a particularized analysis of these arguments where the supreme court did not find them persuasive. As such, defendant's *Miller* challenges based on the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution are without merit. See *People v. Cavazos*, 2023 IL App (2d) 220066, ¶¶ 60, 64 (where there is no *de facto* life sentence, there is no violation of the eighth amendment or the proportionate penalties clause).

¶ 47 Because we have determined that, even preserved, defendant's federal and state constitutional challenges would be unsuccessful, there is no need to address whether plain error is applicable (*People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010) (no plain error where there was no error at all)) or whether counsel was ineffective (*People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 (defense counsel is not ineffective for failing to assert a futile argument)).

¶ 48                                      B. New Sentencing Hearing

¶ 49 Next, defendant argues that the trial court misconstrued the statutory juvenile sentencing factors and disregarded uncontested mitigating evidence, and additionally, that the 42-year sentence is excessive in light of defendant's youth, demonstrated rehabilitation, and background. Accordingly, defendant contends that the sentence was an abuse of discretion and requests that this court either exercise its authority to reduce his sentence or remand for resentencing before a different judge.

¶ 50                                    1. Consideration of Factors

¶ 51     Defendant argues that whether the court improperly applied statutory juvenile sentencing factors requires *de novo* review. On the contrary, the State asserts that defendant's argument is that "his in-range sentence is excessive because the resentencing court misinterpreted, misconstrued, or assigned incorrect weight to the factors in aggravation and mitigation" and such claims are reviewed for abuse of discretion. To the extent that our analysis requires interpretation of the juvenile sentencing statute, defendant is correct that our review would be *de novo*; however, as to any contentions regarding the weight accorded each factor, such decision is reviewed for abuse of discretion. See *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 26. In either case, we find that the trial court did not err in applying the statutory factors.

¶ 52     The procedural component of *Miller*'s holding requires that a sentencer must consider certain factors relevant to a juvenile's youth and its attendant characteristics before imposing a sentence of life imprisonment without parole. *Miller*, 567 U.S. at 469-70. Those factors include, but are not limited to: the juvenile defendant's (1) chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, or failure to appreciate risks and consequences, (2) family and home environment, (3) degree of participation in the homicide and any evidence of familial or peer pressure that may have affected him, (4) incompetence, including his ability to deal with police officers or prosecutor and his incapacity to assist his own attorneys, and (5) prospects for rehabilitation. *Id.* at 477-78.

¶ 53     Following *Miller*, the Illinois legislature enacted 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2022)). Pursuant to the statute, the trial court must consider specific factors when sentencing any person who committed an offense before reaching age 18. Section 5-4.5-105(a) states as follows:

"[T]he court, at the sentencing hearing conducted under Section 5-4-1, shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2022).

Here, defendant claims that the court "misconstrued" the following statutory factors: defendant's age and immaturity, his subjection to negative influences, the mitigating circumstances of the offense, and the absence of evidence of any planning from defendant.

¶ 54    A sentencing court's reliance upon an improper factor only requires remand where the reviewing court cannot determine the weight given to the improperly considered factor. *People v. Beals*, 162 Ill. 2d 497, 509 (1994). The sentencing court need not articulate each and every factor considered in crafting the sentence, and any such omission does not mean the court did not consider all relevant factors. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74. Moreover, not every mitigating factor may be applicable in every case. *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. In reviewing whether the sentencing court properly applied the factors in mitigation and aggravation, this court must consider the record as a whole, rather than focusing on isolated or out-of-context statements. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009).

¶ 55    Our review of the record shows that the resentencing court appropriately and thoroughly addressed all nine factors in section 5-4.5-105(a), as well as those set forth in *Miller*. In fact, each one of these factors was expressly cited by the court in its oral ruling. It is clear from the record that the court carefully contemplated defendant's sentence after reviewing all of the evidence submitted by the parties for resentencing and then imposed a sentence that was 23 years less than defendant's original sentence. Nonetheless, defendant contends that some factors were improperly considered.

¶ 56    We first reject defendant's arguments that the court did not consider defendant's lack of planning and that the court misconstrued the negative influences factor. As to the planning factor, the statute requires the court to consider the defendant's role and degree of participation in the offense, including the level of planning. Here, the court stated that defendant was the primary actor and that he was directly involved in the offense. The fact that the court did not expressly state that defendant did not plan the shooting can hardly be considered error given that the court is not required to articulate each factor and the weight assigned thereto. See *Villalobos*, 2020 IL App

(1st) 171512, ¶ 74. In any case, during its ruling the court specifically mentioned that this was "a totally, random, unprovoked murder," which implicitly shows that the court's awareness of the lack of planning. Regarding the negative influences factor, defendant argues that the court only considered *direct* negative influences but not *indirect* negative influences (such as his incarcerated family members or gang members in the neighborhood). This is demonstrably belied by the record. The court specifically referenced the negative influence of gangs and that defendant "had some negative influences growing up in *** a dysfunctional or chaotic home during his formative years[.]" Nonetheless, the court found that "there is nothing that indicates this crime itself was motivated by peer pressure or familial pressure." Clearly, the court considered indirect negative influences, but it simply did not give it the mitigating weight that defendant seeks. Because we will not substitute our judgment, or defendant's judgment for that matter, for that of the sentencing court, we find this argument without merit. See *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 57 Defendant's remaining arguments are that the court did not consider the mitigating aspects of his age and immaturity and the mitigating circumstances of the shooting.

¶ 58 Regarding age, defendant argues that the court "misunderstood" the factor. According to defendant, the court believed that defendant needed to suffer cognitive deficits that prevented him from understanding the consequences of his actions for his age to be a mitigating factor. He also asserts that the court failed to recognize that defendant lagged behind in reading and math skills and did not consistently attend school throughout his childhood. In defendant's view, the court erred in failing to give his age great mitigating weight. We find no support for defendant's argument in the record.

¶ 59 In its oral ruling, the court acknowledged multiple times that defendant was a juvenile at the time of the offense. Even so, the court did not find that factor particularly mitigating in light

of the circumstances of the offense, where defendant chased the victim down the street and shot him in the back. The court specifically noted that, regardless of his immaturity, defendant should have known that his conduct was wrong and there were no cognitive or intellectual disabilities that would have rendered him incapable of such knowledge. Additionally, defendant's contention that the court should have considered his struggles with school in connection with his age is unavailing as the statute does not require the court do so, except to the extent that it stems from an intellectual disability. In any case, as the court specifically stated that it had reviewed Myers's mitigation report containing that information, we presume the court considered it. See. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19 (absent indication to the contrary, it is presumed the court considered the mitigating evidence presented). Accordingly, we do not find any error in the court's consideration of this factor.

¶ 60     Defendant also argues that the court overlooked the mitigating circumstances of the crime, including the alleged threatening statements made to defendant prior to his shooting the victim. According to defendant, Bullitt, Farmer, and Lewis made threatening statements to scare defendant and defendant felt that he needed to prove something to them. Defendant's report of these statements is found in his recent PSI, as well as Myers's and Dr. Garbarino's report. There was no evidence presented at trial regarding these statements. As such, where there was no evidence presented at trial to support those allegations, we cannot say that the sentencing court was required to consider the alleged threatening statements in mitigation. See *People v. Paige*, 2023 IL App (1st) 220925-U, ¶ 42 ("Nothing in [the statute] prohibited the court from considering the circumstances of the offense, or defendant's degree of participation in the offense, as aggravating if the evidence supported that characterization.").

¶ 61    Additionally, defendant argues that the court specifically disregarded testimony presented at the resentencing hearing that it was difficult for defendant to participate in programming at IDOC because of his lengthy sentence. Godinez, the former executive director of IDOC, testified that programming is mostly available only to "short timers" who are close to their release date, and it was difficult for a "long termer" like defendant to be selected for a program. Despite this evidence, the court stated that it was "a little concerned about the fact that [defendant] didn't really get himself involved in too much programming when he was in the jail" and noted that he was "only now striving to get his GED." The court acknowledged Godinez's testimony that "there were no programs allowed or that the programs were cut back" but stated that "there still were programs there." Ultimately, however, the court found that defendant "has great potential for rehabilitation," especially where he has family members willing to help assimilate him into the community.

¶ 62    "[T]he reviewing court should not focus on a few words or statements of the trial court. Rather, the determination of whether or not the sentence was improper must be made by considering the record as a whole." *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). Additionally, "[e]ven if the sentencing court mentions [an] improper fact, a defendant must show that the court relied on the particular improper fact when imposing the sentence." *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47. Reading the court's statements in the context of its entire oral ruling, spanning 20 pages of transcript, we are hard pressed to find that it improperly considered defendant's rehabilitative potential. The court expressly acknowledged Godinez's testimony as well as the letters in support of defendant and his clean record while incarcerated. As a result of his consideration of that evidence, the court stated that defendant "has great potential for rehabilitation." Thus, the court's single statement that "there still were programs there" does not appear to have altered the court's confidence in defendant's rehabilitative potential, especially

where the court also acknowledged that defendant was now pursuing his GED. Here, it is clear that the court considered all of the evidence presented to support defendant's rehabilitative potential, and as such, we find no error.

¶ 63    "So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range." *People v. Jones*, 2014 IL App (1st) 120927, ¶ 56. Based on our review of the record, the resentencing court did not consider any incompetent evidence or improper factors. Instead, the record reflects that the court assessed each mitigating factor and considered all of the mitigating evidence presented. Accordingly, as we can find no error in the court's consideration of the sentencing factors, we have no basis upon which to remand for resentencing.

¶ 64                                2. Excessive Sentence

¶ 65    Defendant also contends that his sentence of 42 years' imprisonment is unconstitutionally disproportionate when weighed against the nature of the offense, his youth, the lack of aggravating factors, and his rehabilitative potential.

¶ 66    The Illinois Constitution requires that a sentence achieve a balance between the seriousness of the offense and the defendant's rehabilitative potential. *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008) (citing Ill. Const. 1970, art. 1, § 11). Where a sentence is within the applicable statutory range, it will not be considered excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210. A reviewing court will not disturb the sentencing decision absent an abuse of discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005).

¶ 67    In considering the propriety of a sentencing hearing, we give great deference to the trial court as it has discretionary powers in imposing a sentence. *Stacey*, 193 Ill. 2d at 209. This deference is owed "because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than does the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). In particular, the trial court is in the best position to consider "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. [Citation.]" *Stacey*, 193 Ill. 2d at 209.

¶ 68    Defendant specifically argues that the court failed to give proper weight to the information in the mitigation report regarding defendant's childhood, his score of six out of ten ACE factors, Godinez's testimony, and his lack of criminal history. According to defendant, had the court properly considered this evidence, it would have imposed a lesser sentence. Defendant also points out that the court only cited two aggravating factors, serious harm and deterrence, which defendant asserts were given an inordinate amount of weight in determining defendant's sentence.

¶ 69    In this case, defendant was subject to a statutory sentencing range of 20 to 60 years, as well as the discretionary 25-year firearm enhancement. The court declined to impose the firearm enhancement and ultimately sentenced defendant to a 42-year prison term, which the court described as a "midline" sentence. Because the sentence is within the statutory range, we will only find it excessive if it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. Based upon our review of the record, we find that the sentence imposed here was not excessive for the following reasons.

¶ 70   First, we reject defendant's contention that the resentencing court did not sufficiently consider the severity of the adversity defendant experienced as a child. The court noted the discrepancies between the 2005 PSI and the recent mitigation report. The court pointed out that the original sentencing PSI for defendant noted a decent home environment, that defendant "did well in school[,]" his parents were drug addicts but no one else in his family was involved in the criminal justice system, and he had good relationships with his father and siblings. In contrast, the resentencing mitigation report reported that defendant had a "very dysfunctional family," and he witnessed ongoing domestic violence between his parents, who were both addicted to drugs. Nonetheless, the court appeared to give greater credence to the more recent report, which was "much more detailed." As a result, the court specifically considered the information in that report, stating that there does appear to have been "parental neglect," "some physical abuse," and "some childhood trauma, particularly vicarious or secondary trauma watching what was going on in his neighborhood and also watching the contentious relationship with his parents at that time." Although the court did not expressly state the amount of weight it would give to this factor, it is clear that the court properly considered the negative experiences in defendant's childhood. See *Walker*, 2021 IL App (4th) 190073, ¶ 74 ("The fact that mitigation may exist does not require the trial court to reduce a sentence that is otherwise within the statutory range of sentences allowed."). Regardless, "it is not our duty to reweigh the factors" involved in the sentencing court's decision, and thus, we will not question the court's judgment as to this factor where it appropriately considered the mitigating evidence. *Alexander*, 239 Ill. 2d at 214 (criticizing the appellate court for substituting its own judgment for that of the trial court, which is "an improper exercise of the powers of a reviewing court").

¶ 71 The court did not specifically mention the ACE factors and defendant's score of six; however, the court found Dr. Garbarino's report not "very persuasive and compelling" and "very nonspecific" to defendant. "The credibility and weight to give unrebutted testimony of a party's expert at a sentencing hearing are determinations for the sentencing court as the trier of fact." *Kendrick*, 2023 IL App (3d) 200127, ¶ 51. Clearly, the court reviewed Dr. Garbarino's report and determined its mitigating weight, as it is permitted to do. Further, because there is a presumption that the sentencing court considered any mitigating evidence presented (*Walker*, 2021 IL App (4th) 190073, ¶ 74), it was not necessary for the court to explicitly mention the ACE results. The court was also not required to give the ACE factors or Dr. Garbarino's report greater mitigating weight than factors in aggravation, such as the severity of the offense. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55 (the presence of mitigating factors does not mandate a minimum term).

¶ 72 Next, similar to defendant's argument in the previous section, he asserts that the court failed to give proper weight to his rehabilitation potential. Defendant points out Godinez's testimony regarding the lack of access to programs, defendant's "remarkable" prison record, his lack of gang membership, his lack of aggression while in custody, his consistent prison employment, and his perfect attendance in the PACE program. Defendant also contends that his expression of remorse should have been given greater weight.

¶ 73 Clearly, evidence of defendant's positive record while incarcerated was presented to the court. The fact that such evidence was presented does not, alone, support a conclusion that the court failed to consider defendant's rehabilitative potential. This issue, as defendant notes, presents a question of weight. See *Walker*, 2021 IL App (4th) 190073, ¶ 74 (a sentencing court is not obligated to place greater weight on rehabilitative potential than the seriousness of the offense of the need to protect the public). Accepting, *arguendo*, that the court overlooked Godinez's

testimony regarding the unavailability of certain programs, we would not find error. Our review of the record as a whole reveals that defendant's lack of participation in programming was by no means the sole basis of the court's sentencing decision, especially in light of the court's specific reference to defendant's clean prison record, his pursuit of his GED, that his family's support was a "very strong factor in mitigation," and he had "great rehabilitative potential. See *Ward*, 113 Ill. 2d at 526-27 (stating that "the determination of whether or not the sentence was improper must be made by considering the entire record as a whole"). The court addressed each and every factor in detail.  The court's statement regarding defendant's program participation comprised one sentence in the more than 20 pages of transcript from the court's ruling. Based on this record, we are unable to find that the resentencing court abused its discretion regarding defendant's rehabilitative potential.

¶ 74    Additionally, the resentencing court found that defendant's expression of remorse was "self-serving," "scripted," and "contrived to try to meet the matter in mitigation." According to defendant, "there was no valid reason for the court to question [his] remorse." However, again, the court reasonably did not consider defendant's apology sincere because it was inconsistent with the repeated insistence of his actual innocence in his previous court filings. See *Ward*, 113 Ill. 2d at 528 (under certain circumstances, a continued protestation of innocence or lack of remorse may be relevant to the court's consideration of a sentence). Having observed the defendant, the sentencing court "is in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits" and therefore, we will not substitute our judgment for that of the trial court. (Internal quotation marks omitted.) *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 41.

¶ 75　We have considered those cases, cited to us by defendant, where this court found juvenile prison terms excessive because the resentencing court failed to give adequate weight to the evidence of the defendants' rehabilitation. See *People v. McKinley*, 2020 IL App (1st) 191907; *People v. Hill*, 2022 IL App (1st) 171739-B; *People v. Bruce*, 2022 IL App (1st) 210811. We find them unavailing.

¶ 76　In *McKinley*, the defendant, who was 16 years old at the time of the offense, was resentenced to 39 years' imprisonment without parole for one count of first degree murder. *McKinley*, 2020 IL App (1st) 191907, ¶ 78. Evidence of the defendant's rehabilitation included his admittance to the Northwestern University Program, accolades from his professors, good record as an inmate, and a demonstration of remorse. *Id.* ¶¶ 24-39. On appeal, this court found this evidence overwhelming, particularly where the resentencing court only made brief, general references to it and did not afford it adequate weight. *Id.* The court concluded that the defendant was "the epitome of an offender who [had] been restored to useful citizenship" and exercised its authority to reduce the sentence to 25 years. *Id.* ¶¶ 79, 91. However, rehabilitative potential was not the sole basis for the court's decision to reduce the defendant's sentence. The court also found that the trial court made statements suggesting "a predisposition to punish certain types of offenders more harshly[,]" gave improper weight to the deterrence of future criminal conduct, and treated peer pressure as an aggravating factor, rather than a mitigating factor. *Id.* ¶¶ 80, 87-90.

¶ 77　As we have concluded above, we find no evidence of that the court here improperly weighed the sentencing factors. Further, nothing in this record reflects a predisposition by the court to more harshly sentence certain offenders. Additionally, although defendant here has a good record from his incarceration, it does not appear on the record to have been quite as remarkable as that of the defendant in *McKinley*.

¶ 78    In *Hill*, the defendant was found guilty of two counts of first degree murder and one count of attempted first degree murder, which he committed at the age of 15. *Hill*, 2022 IL App (1st) 171739-B, ¶ 1. The defendant was originally sentenced to mandatory life in prison to run consecutively to a 30-year prison term for attempted murder. *Id.* Following successful postconviction proceedings, a resentencing hearing was held, where the defendant presented considerable evidence in mitigation. See *id.* ¶¶ 12-20. This included testimony that the defendant was a "model inmate" and maintained multiple jobs in prison. *Id.* ¶ 19. Testimony from a clinical psychologist was to the effect that defendant had many traumatic experiences as a child, did not have prior criminal history, no serious infractions during incarceration, and support from family members for assimilation back into the community. *Id.* ¶¶ 12-18. Ultimately, the court sentenced defendant to 54 years' imprisonment, noting that a reduction was warranted but it still needed to be "a significant sentence" due to the defendant's role as one of the shooters. *Id.* ¶ 20. On appeal, this court found that the resentencing court did not adequately consider the extensive expert testimony from a clinical psychologist explaining the connection between defendant's youth and his criminal conduct and it did not give the evidence of the defendant's rehabilitation "sufficient consideration" given the psychologist's testimony that the defendant's "juvenile behavior had virtually no predictive value on his likelihood to reoffend as an adult." *Id.* ¶¶ 45, 49. The court concluded that the resentencing court had abused its discretion "in minimizing the effects of [the defendant's] youth on his participation in these murders and his demonstrated ability to conform his conduct to the law as an adult." *Id.* ¶ 49.

¶ 79    We acknowledge some similarities between the defendant in *Hill* and defendant in the instant case, particularly regarding age, a similarly clean prison record, lack of gang participation while in prison, lack of a prior criminal record, involvement in the offense as a shooter, and adverse

childhood experiences. See *id.* ¶¶ 12-20. Significantly, however, the appellate court panel in *Hill* found that the trial court did not give the clinical psychologist's testimony sufficient weight as it related to the defendant's youth and brain development. Here, in contrast, Dr. Garbarino merely submitted a report; he did not testify before the court. That fact should not be minimized where, in *Hill*, the trial court heard live testimony from an expert and the State had the ability to cross-examine the clinical psychologist. Additionally, *Hill*'s summary of the trial court's oral pronouncement of the defendant's sentence includes no mention of the expert's testimony. See *id.* ¶ 20. In contrast, here, the sentencing court explicitly stated that it reviewed Dr. Garbarino's report and did not find it "compelling" or "persuasive[,]" and we have no reason to reject that conclusion. See *Kendrick*, 2023 IL App (3d) 200127, ¶ 51 ("The trial court may reject expert testimony regarding the presence of a mitigating factor even if it is rebutted."). We find these distinctions significant enough to find *Hill* distinguishable.

¶ 80     Finally, in *Bruce*, the defendant, who was a juvenile at the time of the offense, was found guilty of two counts of first degree murder based on accountability and sentenced to a term of natural life in prison. *Id.* ¶ 1. At resentencing, the parties agreed to a 23-year prison term and the court rejected the agreement, sentencing the defendant to 28 years' imprisonment instead. *Id.* On appeal, this court, citing *McKinley*, found that the resentencing court abused its discretion by rejecting the agreed-upon sentence, disregarding the defendant's rehabilitative potential, and failing to properly consider mitigating and aggravating factors. *Id.* ¶ 39. Notably, the dissent in *Bruce* stated that it would have found that the resentencing court considered all appropriate factors and evidence in mitigation and that the majority erroneously substituted its judgment for that of the trial court. *Id.* ¶¶ 52, 55 (Coghlan, J., dissenting).

¶ 81    We express no opinion on the court's reasoning in *Bruce*, particularly as it relates to the sentencing court's rejection of the agreed-upon sentence. Suffice it to say that the facts and circumstances in *Bruce* are markedly different than those before us, where the defendant in *Bruce* was not the shooter, had minimal participation in the offense, and was subjected to pressure from adults to assist in the murder. *Id.* ¶ 32. As such, we do not find *Bruce* analogous.

¶ 82    We also reject defendant's contention that the aggravating factors did not justify a sentence of 42 years. In aggravation, the court pointed out that defendant caused serious harm where he was the principal shooter and the evidence at trial showed that he chased individuals down a street and one was shot and killed because of defendant's actions. Regardless of defendant's juvenile offender status, the seriousness of the offense is still "one of the most important factors for the court to consider." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28. As such, we see nothing improper about the court's consideration of the serious harm caused by defendant's actions.

¶ 83    As to deterrence, defendant asserts that the United States Supreme Court has made it clear that deterrence does not work on juveniles. See *Miller*, 567 U.S. at 472 (stating that specific deterrence does not work because their immaturity makes them less likely to consider potential punishment). That being said, *Miller* and its progeny do not prohibit sentencing courts "from considering the deterrence of others as an aggravating factor in imposing a sentence on a juvenile offender." *People v. Smith*, 2022 IL App (4th) 200666, ¶ 28. As such, it was not an abuse of discretion for the resentencing court here to consider deterrence as an aggravating factor. We acknowledge that, even though the court stated that it did not necessarily believe that deterrence worked, it somewhat then contradictorily stated that a "harsh sentence was necessary to deter others" from committing "unprovoked murder."

¶ 84    Although the court only expressly found two factors in aggravation, we cannot say that a "midline" prison sentence of 42 years was inappropriate based on the evidence presented at the resentencing, especially where the court declined to impose the firearm enhancement. It is the resentencing court's role to strike the balance between the aggravating and mitigating factors (*Walker*, 2021 IL App (4th) 190073, ¶ 73 (citing *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24)), and a resentencing court is not required to give greater weight to mitigating evidence than to the severity of the offense and its attendant circumstances (*Jones*, 2019 IL App (1st) 170478, ¶ 55). Moreover, we may not overturn a sentence merely because the relevant factors could have been weighed differently. *People v. McGowan*, 2013 IL App (2d) 111083, ¶ 10. As such, we conclude that the trial court did not abuse its discretion in sentencing defendant to 42 years in prison, more than a 20-year reduction from his original sentence.

¶ 85    We also briefly note that parole eligibility is a proper factor to consider when determining whether a sentence is excessive. See *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 59 (citing *People v. Peter*, 43 Ill. App. 3d 1068, 1071 (1976)). Thus, where the record shows that the resentencing court properly considered each factor in mitigation and aggravation, the fact that defendant will go before the parole board very soon, if he has not already, provides additional support for our conclusion that his sentence is not excessive.

¶ 86    Because we have determined that the trial court did not err in resentencing defendant, we need not address defendant's argument that resentencing should be conducted by a different judge.

¶ 87                                    C. Increased Sentence

¶ 88    Finally, defendant contends that the trial court improperly increased his original base sentence to 42 years where the "Code of Corrections forbids courts from imposing an increased sentence if the original sentence was vacated through collateral relief, unless based on behavior

after the original sentencing." See 730 ILCS 5-5-4(a) (West 2022). Whether the resentencing court complied with the statute is a matter of law subject to *de novo* review. *People v. Moore*, 359 Ill. App. 3d 1090.

¶ 89    Section 5-5-4(a) of the Code provides:

> "Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5-5-4(a) (West 2022).

¶ 90    Here, defendant was originally sentenced to a 40-year term for first degree murder with a 25-year firearm enhancement, which resulted in an aggregate prison sentence of 65 years. On resentencing, the court declined to impose the discretionary firearm enhancement and sentenced defendant to 42 years' imprisonment for first degree murder. Defendant contends that the 40-year term and the 25-year enhancement are individual sentences, neither of which can be increased on remand pursuant to the statute. By increasing defendant's 40-year term to 42 years, he claims that the resentencing court violated the statute.

¶ 91    We decline defendant's entreaty to consider the 40-year sentence and the 25-year firearm enhancement as separate, distinct sentences. In *People v. Taylor*, 2015 IL 117267, ¶¶ 1, 21, our supreme court, while addressing a different sentencing issue, stated that it would not consider the defendant's 24-year sentence, which was comprised of a 9-year prison term for armed robbery with a mandatory 15-year firearm enhancement, "as two separate pieces." This general principle formed the basis of this court's holding in the earlier case of *People v. Barnes*, 364 Ill. App. 3d

888 (2006). There, at the defendant's original sentencing, the court imposed an aggregate 25-year term for attempted murder, specifically 10 years for the underlying offense and 15 years for a firearm enhancement. *Id.* at 893. Following a successful motion to reconsider his sentence, the court sentenced the defendant to 17 years' imprisonment, as the firearm enhancement had been ruled unconstitutional. *Id.* On appeal, the defendant argued that this was an improper sentence increase, and this court rejected that argument. *Id.* 897-98. Specifically, the court stated that, although the trial court had announced the sentence in terms of its separate components, "neither the language of the [enhancement] statute nor the trial court's ultimate pronouncement of sentence suggests that the penalty imposed for attempted murder consisted of distinct, independent prison terms rather than a single 25-year sentence." *Id.* at 888. Although *Barnes* involved an unconstitutional firearm enhancement, as opposed to here where the resentencing court simply declined to impose a discretionary firearm enhancement, we nonetheless find its determination that firearm enhancements are not distinct prison terms equally applicable here.

¶ 92    This precise issue was also addressed by this court in two recent unpublished decisions involving juvenile offenders. In *People v. Vatamaniuc*, 2023 IL App (2d) 210665-U, ¶ 12, the defendant initially received a 54-year prison sentence, which included a 15-year firearm enhancement. At resentencing, the court declined to impose the firearm enhancement but found that the defendant was the rare offender who was permanently incorrigible and again sentenced him to 54 years' imprisonment. *Id.* ¶ 22. On appeal, the Second District of this court, rejected the defendant's argument that a sentencing enhancement, discretionary or mandatory, is a separate sentence for purposes of section 5-5-4(a). *Id.* ¶ 46. The court could find no precedential caselaw to support the defendant's argument and instead relied on *Barnes* for support of its conclusion that

the resentencing court did not violate section 5-5-4(a) by reimposing a 54-year sentence. *Id.* ¶¶ 43-46.

¶ 93    In *Agosto*, 2023 IL App (1st) 220636-U, ¶ 64, the defendant initially received an aggregate sentence of 56 years, comprised of 25 years for first degree murder, 25 years as a mandatory sentencing enhancement, and 6 years for attempted murder. At resentencing, the court imposed an aggregate 36 years sentence by eliminating the firearm enhancement and imposing a sentence of 30 years for first degree murder. *Id.* On appeal, the defendant sought to parse his sentence into two distinct components and argued that the 30-year sentence for murder was improper even though his aggregate sentence decreased. *Id.* ¶ 65. This court disagreed, following *Vatamaniuc* and finding that weapons enhancements are simply not treated as separate sentences under Illinois law. *Id.* ¶¶ 66-69. Defendant here provides us with no reason to veer from *Vatamaniuc* or *Agosto*, and thus we agree with the holdings in those cases that a firearm enhancement is not considered a separate sentence for purposes of section 5-5-4.

¶ 94    We agree as well with the *Agosto* court's reliance on public policy concerns in support of this conclusion. The court stated that the defendant's restrictive interpretation of section 5-5-4(a) would "limit judicial flexibility, potentially discouraging major sentence reductions when the resentencing court does not wish to reduce the sentence by the enhancement's full value." *Id.* ¶ 72. "[A]llow[ing] the courts to tailor sentences according to each case's specific facts and circumstances" also comports with the current approach to juvenile sentencing in the wake of *Miller*, which requires courts to consider a wide variety of aggravating and mitigating factors in imposing discretionary sentences. See *id.* ¶ 71.

¶ 95    The court in *Agosto* also rejected the defendant's reliance on *People v. Kilpatrick*, 167 Ill. 2d 439 (1995), where that case involved consecutives sentences, which are considered separate

sentences under Illinois law. See *Agosto*, 2023 IL App (1st) 220636-U, ¶ 65 (citing *Kilpatrick*, 167 Ill. 2d at 446). We agree with this distinction and find *Kilpatrick*, upon which defendant relies, inapposite.

¶ 96   Finally, we reject defendant's reliance on *People v. Taylor*, 2023 IL 128316. There, our supreme court resolved a split in appellate court authority as to whether statutory firearm enhancements could apply "cumulatively," or stated another way, whether a defendant could receive an extended sentencing based on his attempted murder of a peace officer and his use of a firearm. *Id.* ¶¶ 46-57. The defendant in *Taylor* argued that to impose both would be an improper double enhancement. *Id.* ¶ 44. The supreme court concluded that a firearm enhancement could be imposed in addition to the extended sentencing based on an aggravating factor, *i.e.* firing at a peace officer, and there was no impermissible double enhancement. *Id.* ¶¶ 61, 66. We do not find *Taylor* applicable here, and nothing in its holding suggests that enhancements are "discrete components" of a defendant's sentence. Instead, the court stated that the enhancement can be "added to the term of imprisonment imposed by the court." *Id.* ¶ 61. To us, that signals that an extended baseline sentence and an enhancement nonetheless result in *one* term of imprisonment as related to a single crime, which actually supports our conclusion here.

¶ 97   For the foregoing reasons, we conclude that the 25-year firearm enhancement was not a discrete component of defendant's sentence, defendant's aggregate sentence was reduced from 65 years to 42 years on resentencing, and thus section 5-5-4(a) was not implicated here.

¶ 98                                   III. CONCLUSION

¶ 99   For the reasons stated, we affirm the judgment of the circuit court.

¶ 100  Affirmed.