2025 IL App (1st) 221395-U

Fourth Division
Filed September 11, 2025

No. 1-22-1395

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| Plaintiff-Appellee, | ) Circuit Court of Cook County |
| | ) |
| v. | ) No. 10 CR 1198901 |
| | ) |
| LAVERT BONNER, | ) The Honorable Patrick K. Coughlin, |
| Defendant-Appellant. | ) Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Justice Lyle concurred in the judgment.
Justice Rochford concurred in part and dissented in part.

**ORDER**

¶ 1     *Held*:  The sentence was vacated, and the cause remanded for a new sentencing hearing, where the sentencing court abused its discretion by (1) crediting Bonner's trial testimony but not affording it mitigating weight, (2) taking a view of the nature of Bonner's upbringing that was not reasonable based on the evidence before it, and (3) choosing a sentence that reflected a balance of aggravating and mitigating factors that was not consistent with the court's statements and findings at the sentencing hearing.

¶ 2     Lavert Bonner was 17½ years old when he shot and killed Lawrence Mack in front of Mack's house on April 19, 2010. In 2015, he was found guilty of first degree murder, and in 2022, the circuit court sentenced him to 38 years' imprisonment. On appeal, we must decide whether, in imposing that sentence, the sentencing court abused its discretion.

¶ 3                    I. BACKGROUND

¶ 4                    A. Bench Trial

¶ 5     At trial, there was no dispute that Bonner had shot and killed Mack, but Bonner argued that he had acted in defense of himself or of Rahim. In general, the evidence showed that, on the afternoon of April 19, 2010, a distinctive Chevrolet Monte Carlo belonging to codefendant Abdul Aziz Rahim, who was driving, stopped in front of Mack's home on Sherwood Avenue in Markham. From the passenger seat, Bonner fired at least one shot in the direction of a group of people that included Mack, who was fatally struck by a bullet, before Rahim sped away.

¶ 6     The State presented the testimony of two uninvolved witnesses. Tishia O'Harrow testified that she was talking to a friend when she heard two gunshots, looked up, and saw a gun that had been stuck out the window being pulled back into the passenger's side of a late model Monte Carlo with a differently colored driver's door. Davick Barnes testified that he and a companion were walking down the sidewalk when a car drove past them down the street, stopped, and backed up about two houses, at which point he heard two to four gunshots, prompting him to hide in a bush.

¶ 7     The State also presented the testimony of two of Mack's friends. Calvin Gassaway testified that he was walking down the sidewalk toward Mack's house when he saw Rahim drive his car past headed toward Richmond Avenue (*i.e.* eastbound), with Bonner sitting in the passenger seat. About one minute later, he saw Rahim's car again headed eastbound, but this time it stopped and backed up in front of Mack's house. He saw a gun extend out from the passenger's side window, heard two shots, and saw Rahim's car drive off. Mike Austin testified that he was in front of Mack's house when he saw Rahim's car drive past headed toward Kedzie Avenue (*i.e.* westbound). Five to seven minutes later, Rahim's car returned, this time headed eastbound. It drove past before backing up, and he saw Bonner fire one shot with a gun from the passenger seat. Someone within the group in front of Mack's house returned fire, and Rahim's car sped away.

¶ 8     The State called another friend of Mack's, Daniel Duprey. Duprey denied being present for the shooting, but he acknowledged that, in May 2010, he signed a statement saying otherwise and had given testimony before a grand jury to similar effect. According to that prior statement and

testimony, Duprey was driving Mack and another friend back from a trip to the liquor store when he saw Rahim and Bonner in Rahim's car at 160th Street and Sawyer Avenue (one street north and one street west of Mack's block). Later, he was in front of Mack's house with Mack when he saw Rahim's car again. He started yelling profanities at Rahim and Bonner because he did not like how they looked at him while driving by. Rahim screeched the car to a stop and then backed up. Bonner pointed a chrome revolver at him and Mack through the passenger's window and fired one shot. Duprey ran around the side of the house, retrieved a Glock 20, and ran back to front of the house, at which point Bonner shot at him again. Duprey responded by firing several shots as Rahim's car sped away.

¶ 9        Bonner testified on his own behalf. According to his testimony, he met up with Rahim at a nearby gas station. While they were there, his sister—who was visiting a friend in Mack's neighborhood—called and asked to borrow $10 from him, so Rahim agreed to drive him there. Their route took them past Mack's house. As they drove past, he saw a lot of people in front of Mack's house, including Duprey, who waved at them to stop. Rahim obliged and rolled down the window, and Duprey asked, "Why the f*** are y'all riding down our block?" Rahim responded that they were grown and needed to "squash the beef," at which point Mack stepped forward and responded that the only way to do that was for someone to get out of the car and fight. While Rahim and Mack argued, Bonner saw Duprey walk around toward the back of Mack's house before reappearing with a gun in his hand. Bonner tapped Rahim to warn him to drive away, but Rahim was too wrapped up in the argument to respond. Afraid that Duprey meant to shoot them, Bonner retrieved Rahim's gun from an "armrest." He looked back out the window and saw Duprey cocking his own gun and raising his arm as if to shoot. Fearing for his life and afraid he did not have enough time to take careful aim, Bonner quickly fired a shot out of the window. Snapped out of his argument, Rahim sped away.

¶ 10       Bonner admitted that, while speaking to detectives after his arrest later that day, he first told them that he had not been in the car with Rahim and had not done any shooting. The following day, he admitted that he had been in the car with Rahim and that they had driven past Mack's house

once, gone around the block, and gone past it again. He maintained that Rahim had shot the gun, but he later said that Rahim passed him the gun and told him to "fan" anyone who ran up to the car. At trial, he testified that the police had told him off-camera to blame Rahim for the shooting so he could go home.

¶ 11 During closing arguments, the State contended that, after driving past Mack's house and seeing people outside, Rahim and Bonner came up with a "plan" and then returned to execute it. The defense argued that the State had not carried its burden of disproving self-defense. Deeming Bonner's self-defense testimony to not be credible, the trial court found him guilty of first degree murder.

¶ 12                          B.  First Sentencing Hearing

¶ 13 Limited information was presented to the court at Bonner's first sentencing hearing, which took place in 2015. The presentence investigation report was based on information given by Bonner and his mother to a probation officer. Based on a records search, the report related that Bonner had no previous convictions and a single previous arrest, for battery, that did had not led to any court proceedings.

¶ 14 The rest of the report was based on an interview with Bonner, although the information about his social history had been "confirmed" by his mother, Gwendolyn Orange, who spoke to the report's author on the telephone. The report stated that Bonner's parents had separated when he was two years old, and his father did not play a significant role in his life, so Orange had raised Bonner and his two older siblings, Tyeisha (his sister) and Terrence (his brother), living at various addresses in the south suburbs. It noted that, at the time of Bonner's arrest, he was "staying with" his aunt and uncle in Markham so he would not be home by himself when his mother worked late. Bonner reported having "always had a good relationship" with his mother, his siblings, and his aunt and uncle. He "never experienced abuse or neglect," he had not had any contact with the Department of Children and Family Services, and he was not aware of anybody he lived with having substance abuse problems. In 2009, while in the ninth grade, he was "involved in a fracas

on the school bus," so his mother took him out of high school before he was suspended; after that point, he attended GED classes at a community college. The report noted, without any further detail, that Bonner had worked at his grandfather's barbeque restaurant in Markham since his early teens.

¶ 15 In addition to the presentence investigation report, the State read two victim impact statements into the record, one from Mack's sister and the other from his mother. In his allocution, Bonner apologized to Mack's mother and said that he did not meant to harm her family.

¶ 16 The court's sentence pronouncement was brief. It noted its belief that Bonner's apology to Mack's family was sincere. It then found that there was "a lot of mitigation," citing Bonner's youth, his "room for rehabilitation," and his sincere acceptance of responsibility for his actions. In aggravation, the court found that Bonner had caused Mack's death. It also found that there was a need to deter others from engaging in similar "senseless pulling of a trigger *** with no regard whatsoever for the possible ramifications until it is too late." Explaining that Bonner deserved neither the minimum nor the maximum, the court then sentenced him to 50 years' imprisonment, five years longer than the minimum sentence of 45 years, including a then-mandatory 25-year firearm enhancement.

¶ 17 C. Direct Appeal

¶ 18 On direct appeal, we found that the trial court erred by relying on the fact of Mack's death as an aggravating factor because it was inherent in the offense of first degree murder, so we vacated the sentence and remanded. *People v. Bonner*, 2019 IL App (1st) 151097-UB.

¶ 19 D. Second Sentencing Hearing

¶ 20 The evidence at the second sentencing hearing was much more extensive than it had been at the first.

¶ 21 1. Mitigation Report

¶ 22 In anticipation of the resentencing, the defense asked mitigation specialist Helen Kim Skinner to conduct a mitigation investigation. Skinner's resulting report, a dense 21-page document

detailing Bonner's family background, childhood, and life in prison, was the product of more than 100 hours of investigation, during which she obtained and reviewed records (legal, educational, and correctional), interviewed Bonner five times, and interviewed six friends or family members.

¶ 23 According to the report, Bonner's childhood was marked by instability and parental neglect. He lived with his mother and his alcoholic father in Markham until he was five years old, at which time two significant changes in his life took place. First, his father, who would regularly not come home for days at a time, simply did not return, a fact that his mother did not acknowledge. Second, two older siblings he had not known about before—his sister Tyeisha and his brother Terrance Jr.—started living with them because Tyeisha, a high-school freshman who had been raised by her grandparents, wanted to get to know her mother. In short order, Bonner's mother took advantage of the situation by leaving for days at a time and staying at her boyfriend James Weeden's house in Chicago, where she worked a mail route, leaving it to Tyeisha to take care of Bonner. That arrangement persisted until Bonner was in fourth grade, when he moved to a new house in neighboring Country Club Hills with his mother and Weeden. Bonner lived at their house for two years, but he was usually left alone and unsupervised while his mother and Weeden worked. When he was in sixth grade, his mother and Weeden moved to Lynwood, but Bonner spent the year living with Tyeisha, his aunt and uncle, and his grandparents in Markham. During that time, Weeden—whom Bonner had started seeing as a father figure—and his mother broke up. For seventh grade, Bonner moved back in with his mother, who had rented an apartment in Calumet City, but she sent him back to live at his grandparents' house in Markham after he started "acting out." Bonner left high school before the end of his freshman year, apparently to avoid a suspension or expulsion after some kind of incident on a school bus. After that, Bonner attended GED classes at a community college, but he did not take the exam and eventually stopped attending. Although he continued living with at his grandparents' house until his arrest in this case, he frequently asked to move back in with his mother, who refused his requests and habitually broke off plans she had made to see him.

¶ 24　　The report further documented how these circumstances affected Bonner's development. It noted that, although Bonner tended to do better in school when his mother was present in his life, his academic performance was consistently poor, even repeating third grade. During elementary school, Bonner sometimes got in trouble for minor things that his aunt described as "weird" or "dumb," such as being in the hallway instead of the classroom. But in junior high, Bonner's behavioral issues seriously escalated. After moving to Calumet City with his mother, Bonner started spending considerable amounts of time with a group of older males he met wandering around his neighborhood before his mother got home for work and after she fell asleep. According to the report, he felt honored that they would accept him enough to allow him to be around them. Many of the men had nice cars and other valuable things because they sold drugs. Under their influence, Bonner started smoking marijuana and then started selling it. Eventually, he started getting in trouble in school, too. His mother responded by sending him back to live with his grandparents because he was "out of control." Back in Markham, though, the problems only grew. He started getting into fights, skipping school with a new group of friends, and smoking marijuana all day long. He was repeatedly suspended from school and his grades, already poor, got even worse. His behavioral issues continued in high school: he was caught stealing soda from the cafeteria and cutting class before the incident on the school bus prompted him to leave school. While attending GED classes, Bonner once again fell in with a group who sold drugs and stole cars, although he tried to stay away from them after the police questioned him about a car theft.

¶ 25　　A crucial part of the mitigation report was its account of Bonner's relationship with Rahim, which it described as "extremely close and connected." They met through Tyeisha, who had entered a serious relationship with Rahim and, eventually, became pregnant. Rahim was nine years older than Bonner. He had a felony record that included a conviction for armed robbery. He made money by selling crack cocaine, and, despite his record, carried a gun with him. Despite this, Tyeisha encouraged Bonner to bond with Rahim, reasoning that they would soon be brothers-in-law and that Bonner would be an uncle to their son. Bonner and Rahim started to spend more and more time together—eventually, more time than Rahim spent with Tyeisha. According to Bonner's

aunt, "[Rahim] became [Bonner's] friend instead of Tyeisha's boyfriend." Bonner saw Rahim as being both a best friend and an older brother, and he spent all his time at Rahim's house or accompanying Rahim in his car. Their close relationship continued even after Rahim and Tyeisha broke up, at one point prompting Bonner's mother, who could not understand why Rahim was so important to Bonner, to tell the older man, "Stop hanging out with my child!" Although Bonner's family now regrets allowing Bonner to spend so much time with Rahim, Bonner's aunt told Skinner that, at the time, they "didn't really know Levert wouldn't be safe with him."

¶ 26     The remainder of the mitigation report detailed Bonner's life in prison after his original sentencing in 2015. It reported that, as of 2022, Bonner had six documented disciplinary infractions within the Department of Corrections. The first two, received in 2016 during his first year at Menard Correctional Center, were for fighting; both landed him in segregation. In 2018, he was cited while still at Menard for a minor infraction, which was disobeying a direct order. The final three infractions occurred at Stateville in 2018 and 2019, and all involved allegations that he was masturbating. The mitigation report related that Bonner developed a romantic relationship with a woman he knew from junior high but that she had put the relationship on hold due to uncertainty about how long he would remain in prison. It stated that, if and when Bonner is released from prison, he intends to pursue a career as a truck driver, barber, or auto mechanic. And it also noted that, despite his long sentence limiting his opportunities for rehabilitative programming, he had earned a handful of certificates, which were attached to the report as exhibits.

¶ 27                                     2.  Psychiatric Report

¶ 28     The defense also retained Dr. Paul Nierman, a psychiatrist at the University of Chicago with 30 years of experience in child and adolescent psychiatry, to evaluate Bonner's neurological development both before and after the shooting. After speaking to Bonner over four videoconferences in early 2022 and evaluating various documentation, including Skinner's mitigation report, Dr. Nierman prepared his own report.

¶ 29       In his report, Dr. Nierman found that the circumstances of Bonner's childhood deprived him of the neurological building blocks that are required for typical emotional and cognitive development. According to Dr. Nierman, significant circumstances in Bonner's early childhood were his alcoholic and inattentive father, who eventually abandoned him, a period of time in which his primary caretaker was his teenage sister, sometimes not having enough food at home, and frequently moving to new homes and new schools. Dr. Nierman identified Bonner's academic performance as an objective indication of his developmental delay: as early as second grade, Bonner had already fallen behind more than 90% of his peers in reading, and he was held back in third grade. According to Dr. Nierman, those problems snowballed through the middle years of Bonner's childhood. He once again lost another father figure when his mother broke up with James Weeden. Bonner continued shuttling between his grandparents' home and his mother's home, switching schools each time. When he stayed with his mother, she was regularly absent, leaving him with a great deal of unsupervised time. He used that time to start building relationships with older boys and men, whose negative influence led him to start using and selling marijuana. When he stayed with his grandparents, he had ongoing behavior problems at school, and he missed 35 days during eighth grade, most of which were attributable to suspensions, before being forced to leave high school after an incident on a school bus. After Bonner's departure from high school, Dr. Nierman explained, he continued associating with negative influences. He also started looking up to Rahim as an older brother.

¶ 30       Dr. Nierman described Bonner's neurological development at the time of the shooting as follows:

> "[Bonner] had not received the adequate or sufficient experiential nutrients to develop prosocial cognitive, emotional and moral character necessary for maintaining one's self in a civil society. He was emotionally immature; impulsive[,] anxious and reactive; distracted and overstimulated by anti-social behaviors; very vulnerable to negative influences, and likely depressed. These factors are all sequelae of a

> failure to develop the neurophysiological pathways associated with normal development and self-regulation."

Dr. Nierman also put it in less clinical terms: when he shot Mack, the then-17-year-old Bonner "was living a life where it was easy to become someone who finds themselves in the wrong place at the wrong time."

¶ 31    Dr. Nierman also discussed Bonner's continued neurological development after his arrest. His opinion was that Bonner, who was by that time 30 years old, had shown significant cognitive, social, behavioral, and moral development. He explained that this maturational process was to be expected between the ages of 17 and 30. He opined that Bonner's specific maturation had been aided by the discipline and restraints imposed by living in the structured prison environment, which had forced Bonner to do more "mental exercise" than he had during his childhood, leading him to develop the higher levels of cognition—such as self-reflection and forethought—that he had lacked at the time of the shooting.

¶ 32                            3.  Presentence Investigation Report (2022)

¶ 33    Before the resentencing hearing, the court ordered the probation department to conduct a social investigation and prepare a new presentence investigation report. The report, which was based entirely on a review of official records and an interview with Bonner, added little to what was already known. Relevant here, it repeated certain things that Bonner told the report's author during the interview. As to his upbringing, Bonner reported that "he did not have any developmental or childhood trauma except for his father not being around." He described his childhood as "fair" and said that "all his basic needs were met." He said he had not experienced "any type of abuse" and had never been involved with the Department of Children and Family Services. He characterized his relationships with his mother and his maternal siblings as "good" or "great," and he described his family as "supportive." As to his peer group, Bonner admitted that he "would hang out with the wrong crowd usually," and he said that he had been "affiliated with the Gangster Disciple[s]" since the age of 12. As to the shooting, the report indicated, inaccurately,

that Bonner had "stated two to three people were shooting at him while he was driving past" Mack's home; that error was corrected by the defense at the resentencing hearing. Otherwise, the account Bonner gave was consistent with his trial testimony that he acted in self-defense. He acknowledged that "he was not taking any thought of risks and consequences into consideration when the incident happened," and he said that "he received no outside pressure to do the shooting because it was an incident that had no planning or thought."

¶ 34                                    4.  Hearing

¶ 35       At the resentencing hearing, the State read a new victim impact statement written by Mack's mother. The defense introduced Dr. Nierman's psychiatric report and Skinner's mitigation report into evidence.

¶ 36       The only witness at the hearing was Dr. Nierman, who was called by the defense. He testified consistently with his report that, in his opinion, at the time of the shooting, Bonner was "extremely impulsive, emotionally young, and cognitively far below his chronology [*sic*] peers" because he was "lacking in many of the developmental expectations that would have helped him to be successful in dealing with system [*sic*] and social situations and highly likely to act impulsively." He also opined that Bonner's conduct in prison showed that his neurological development was "now reflective of someone who's brain has calm[ed] down and is accumulating information into a much more prosocial standard." According to Dr. Nierman, Bonner was now "much less likely to be as impulsive as he maybe once was." The State did not cross-examine Dr. Nierman.

¶ 37       During argument, the State focused on the youth sentencing factors that applied because Bonner was 17 years old at the time of the offense. See 730 ILCS 5/5-4.5-105(a) (West 2022). It argued that Bonner was almost 18 at the time of the shooting, "acted alone" based on his trial testimony, had been cited for six infractions in prison, and "grew up with his mom and aunt in a loving environment." It also contended that despite his expression of remorse, Bonner was still maintaining that he acted in self-defense. In mitigation, the defense argued that Bonner's actions had been motivated by his strong attachment to Rahim and that the trial court had not adequately

considered the possibility that Bonner was guilty of second degree murder via imperfect self-defense (and defense of Rahim). In lieu of an oral allocution, counsel read a letter prepared by Bonner that, like his statement at the first sentencing hearing, apologized to Mack's family.

¶ 38    The court took a recess to "review the exhibits that were admitted and consider the arguments of the attorney[s]." Upon resuming after what the transcript states was a "[s]hort recess," the court indicated that it had reviewed the transcripts of the trial and the original sentencing hearing, the decision on direct appeal, the presentence investigation report, the arguments of the attorneys, Dr. Nierman's testimony, and "the other exhibits that were admitted."

¶ 39    The court began by summarizing the information in the presentence investigation report. Its discussion of Bonner's childhood drew exclusively from what Bonner told the probation officer who put together the presentence investigation report:

> "The Defendant, in the presentence investigation report, reported no development or childhood trauma except that his father was not around and indicated that his father has now passed. He indicated a good relationship with his mother and siblings.
>
> * * *
>
> *** He indicated he got to the ninth grade [and] got along well with his teachers and classmates, but was suspended for an incident that occurred apparently on a bus.
>
> In the PSI, at least, he indicated that his childhood was fair. That all his basic needs were met. He did not report any abuse or DCFS involvement. His family was described as supportive and he did indicate that he did run[ ]away from home. That he wanted to do his own things.
>
> He reported working at a family restaurant. He said that he was associated with the GDs or Gangster [D]isciples, street gang, clarifying that was starting around 12 years his first involvement with that gang. He admitted to hanging around with the wrong crowd as well."

In addition to Bonner's childhood, the court noted that, according to the presentence investigation report, Bonner said that he was 17½ years old at the time of the shooting; that he had received certificates for completing life-skills courses while in prison; that he would like to get a GED but there was no available program to do so at his prison; that he was in good health and not taking any medications; that he occasionally saw a mental-health professional and had been diagnosed with depression, an impulsive disorder, and an adjustment disorder; that he had used, but not abused, alcohol and cannabis; and that he had trouble controlling his impulses or thinking through consequences before acting. During this discussion, the court also referred to other materials. Specifically, it observed that Bonner's certificates were "attached as exhibits that the Court did review"; it noted that, although Bonner was not currently taking medication, "[t]he exhibit [*sic*] submitted and mitigation" indicated that he had taken medication while in prison up until about two years before; and it remarked that Bonner's self-assessment as to his impulse control was consistent with "the finding of the Defense's expert."

¶ 40    After reviewing the presentence investigation report, the court announced that it had "also considered, specifically, the Defendant's youth, and [its attendant] circumstances." The court then recited that it had considered each of the nine specific mitigating factors listed in the juvenile-sentencing statute. See 730 ILCS 5/5-4.5-105 (West 2022). As to age, impetuosity, and maturity (see *id.* § 5-4.5-105(a)(1)), the court additionally stated: "Obviously, those are factors that apply according to the reports that were submitted. Defendant was 17 and a half years of age." (Paragraph break omitted.) As to outside pressure, including negative influences (see *id.* § 5-4.5-105(a)(2)), the court said that it had reviewed Bonner's social history and family situation, but it added, "I also considered though that the Defendant indicated that he did not feel outside pressure to actually do the shooting for which he was convicted of. He continues to claim self-defense at the time of trial and even until today." As to Bonner's rehabilitative potential (see *id.* § 5-4.5-105(a)(4)), the court said that it agreed with the judge who had imposed the original sentence "that the Defendant does have potential for rehabilitation." It noted that Bonner was able to meaningfully participate in his own defense by testifying at trial. See *id.* § 5-4.5-105(a)(7). It indicated that it had considered

Bonner's "lack of any prior criminal history." See *id.* § 5-4.5-105(a)(8). And it said that it had "also considered the Defendant's expression of remorse as stated in his original allocution as well as the words that were read today by his attorney." See *id.* § 5-4.5-105(a)(9).

¶ 41    At the conclusion of its remarks, the court sentenced Bonner to 38 years' imprisonment.

¶ 42                                II.  ANALYSIS

¶ 43    On appeal, Bonner challenges his sentence on three grounds. First, he argues that the sentencing court improperly increased his "base" sentence from 25 years to 38 years. Second, he contends that the sentence was an abuse of discretion.

¶ 44                        A.  Increase to "Base Sentence"

¶ 45    By statute, when a defendant is resentenced after the original sentence is set aside on appeal, as it was here, the court cannot impose a new sentence that is "more severe than the prior sentence *** unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5-5-4(a) (West 2022). Here, Bonner's original sentence was 50 years' imprisonment, and his new sentence was 38 years' imprisonment. Obviously, 38 years is not "more severe" than 50 years. Bonner insists, however, that the new sentence violates the statute because his original sentence was determined by adding a 25-year firearm enhancement to what he calls a "base sentence" of 25 years, while his new sentence consists solely of a 38-year "base sentence," with no firearm enhancement.

¶ 46    We do not need to belabor the point. Illinois courts have routinely rejected the theory that the firearm enhancements operate as a second discrete sentence that is served in addition to some "base" sentence. See *People v. Barnes*, 364 Ill. App. 3d 888, 897 (2006); *accord People v. Cox*, 2025 IL App (1st) 230602-U, ¶ 96; *People v. Garza*, 2025 IL App (1st) 231600-U, ¶ 51; *People v. Gomez*, 2023 IL App (1st) 220810-U, ¶ 42; *People v. Agosto*, 2023 IL App (1st) 220636-U, ¶¶ 61-73; *People v. Vatamanuic*, 2023 IL App (2d) 210665-U, ¶ 46. All that matters is the final number. And here, 38 years is plainly less than 50 years. There was no error.

¶ 47       B. Sentencing Court's Consideration of Mitigating Evidence

¶ 48  Bonner next contends that the sentencing court abused its discretion when imposing the sentence. He advances several specific arguments that, between them, challenge both the manner in which the court assessed the evidence and the court's ultimate conclusion that 38 years was the appropriate sentence to impose.

¶ 49  The choice of the appropriate sentence in a particular case is entrusted to the sound discretion of the circuit court. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Hence, we review sentencing determinations for an abuse of discretion. *Id.* 209-10. An abuse of discretion exists where no reasonable person would take the position adopted by the trial court [citation], or where the trial court acts arbitrarily, fails to employ conscientious judgment, and ignores recognized principles of law." *In re Commissioner of Banks & Real Estate*, 327 Ill. App. 3d 441, 476 (2001). When reviewing an exercise of discretion, we "must look to the criteria on which the trial court should rely." *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). We determine whether the court applied those criteria when it weighed the facts, examine whether the way the court reached its result was legally adequate, and consider whether the result is itself within the bounds of what is reasonable. *People v. Ortega*, 209 Ill. 2d 354, 360 (2006); see also *People v. Thomas*, 76 Ill. App. 3d 969, 975 (1979) ("The determination of whether a particular sentence is erroneous is made by reviewing the record to see if the trial judge fairly and accurately applied the sentencing criteria."). In doing this analysis, the focus must remain on the court's sentencing determination. We will not disturb the sentence merely because we would have weighed the relevant facts and circumstances differently. *Streit*, 142 Ill. 2d at 19.

¶ 50           1. The Relevant Criteria

¶ 51  In general, sentencing in Illinois is constrained by article I, section 11, of our state constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This provision checks both the legislature's power to set penalties in the first instance and the courts' authority to impose sentences in individual cases. *People v.*

*Clemons*, 2012 IL 107821, ¶ 29. It contains two distinct limitations on a judge who imposes sentence. The requirement that the sentence be proportioned to the seriousness of the offense has always been a part of Illinois constitutional law and is understood to be analogous to the eighth amendment's prohibition of cruel and unusual punishment. *Id.* ¶¶ 37-38; see Ill. Const. 1870, art. II, § 11; Ill. Const. 1848, art. XIII, § 14; Ill. Const. 1818, art. VIII, § 14. But the second requirement goes beyond the eighth amendment and the earlier versions of our state's proportionate penalties clause by explicitly requiring that a sentence be set with the goal of rehabilitating the offender. *Clemons*, 2012 IL 107821, ¶¶ 39-40. The point of the new provision was not to ignore the nature of an offense, but to reflect our society's understanding of penology to encompass both the nature of the offense *and* the nature of the offender. See *id.* ¶ 39 (quoting 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1391 (statements of Delegate Foster)).

¶ 52        For first degree murder, the ordinary sentencing range is 20 years to 60 years. 730 ILCS 5/5-4.5-20(a). Because the State proved that Bonner personally shot and killed Mack, his sentence was subject to a firearm enhancement of "25 years or up to a term of natural life." *Id.* § 5-8-1(a)(1)(d)(iii). But because Bonner was under the age of 18 years, that enhancement was discretionary, not mandatory. *Id.* § 5-4.5-105(f). Thus, the applicable range of sentence was anywhere from 20 years to natural life. Of course, as the court noted, the sentence it chose could not exceed the original 50-year sentence. See *id.* § 5-5-4(a).

¶ 53        As for determining the sentence within that range, the sentencing court was required to consider a host of constitutional and statutory criteria. First, as we have indicated, there are two constitutional criteria a sentencing court must consider: the seriousness of the offense and the objective of rehabilitation. Ill. Const. 1970, art. I, § 11. The court must also consider the statutory mitigating and aggravating factors that apply at all sentencing hearings. See 730 ILCS 5/5-5-3.1(a), 5-5-3.2(a) (West 2022). Additionally, for juvenile offenders, the court must consider several youth-specific mitigating factors. At the time of Bonner's second sentencing, those factors were:

> "(1) the person's age, impetuosity, and level of maturity at the time
> of the offense, including the ability to consider risks and consequences

of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a).[1]

The record shows, and Bonner does not dispute, that these were the criteria the court relied on.

---

[1] The present version of the statute contains three additional factors: "(9) the person's involvement in the child welfare system; (10) involvement of the person in the community; [and] (11) if a comprehensive mental health evaluation of the person was conducted by a qualified mental health professional, the outcome of the evaluation." (Paragraph breaks removed.) 730 ILCS 5/5-4.5-105(a)(9)-(11) (West 2024).

¶ 54                          2.  Manner of Determining Sentence

¶ 55        Having ascertained the relevant criteria, we next examine "the legal adequacy of the way the trial court reached its result." *Ortega*, 209 Ill. 2d at 360. At this point in the analysis, we are not asking whether the ultimate "result is within the bounds of reason" (*id.*)—*i.e.* whether the 38-year sentence is disproportionate or excessive. Instead, we are evaluating the process the court used to determine the sentence.

¶ 56        Bonner's brief makes many specific points about how the trial court assessed the evidence at sentencing. We find three persuasive.

¶ 57        First, the court's assessment of Bonner's self-defense testimony was not reasonable. Two versions of the circumstances leading up to the shooting were offered at trial, both of which included significant mitigating circumstances. The first version, proffered by the State at trial, was based on Bonner's stationhouse admissions. Under that theory of the case, Rahim and Bonner drove past Mack's house once. They then drove around the block, stopped, and formulated a plan, and Rahim gave Bonner the gun. Then, they circled back around to Mack's house, at which point Bonner fatally shot Mack. Taking that theory as true, Bonner would have been "subjected to outside pressure, including *** negative influence[ ]" from Rahim (see 730 ILCS 5/5-4.5-105(a)(2)) (West 2022)), and his actions would have been "induced or facilitated by someone other than" himself (see *id.* § 5-5-3.1(a)(5)). The second version, proffered by the defense, was based on Bonner's trial testimony that he pulled Rahim's gun out from its hiding spot and shot because he saw Duprey approaching the car and leveling his own firearm. At minimum, under that theory, there would be "substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" (see *id.* § 5-5-3.1(a)(4)), particularly since Bonner's snap assessment of the situation and decision to respond by shooting would have been affected by his "impetuosity," including his "ability to consider risks and consequences of behavior" (see *id.* § 5-4.5-105(a)(1)).

¶ 58        Essentially, the resentencing court could have chosen to weigh in mitigation either (1) that Bonner acted under Rahim's influence (as per the State's trial theory) or (2) that Bonner acted out

of a belief that he needed to protect both himself and Rahim from the threat he believed that Duprey posed. At the hearing, the court credited the self-defense testimony, observing that it had considered that Bonner "indicated that he did not feel outside pressure to actually do the shooting" and that he was "continu[ing] to claim self-defense." That may have been reasonable. But as just noted, accepting Bonner's self-defense testimony meant also giving it mitigating weight, because that testimony described a poor decision made under high stress, not a cold-blooded and premeditated killing. The record does not show that the court considered that testimony as mitigating—only as undermining the mitigation inherent in the State's trial theory. That was unreasonable.

¶ 59    Second, the court's assessment of Bonner's family history as "supportive" was not a reasonable view to take given the evidence before it. It is clear from the transcript that this finding was based entirely on Bonner's own characterization of his childhood found in the presentence investigation report. But that characterization is plainly at odds with the detailed information set out in Skinner's mitigation report and Dr. Nierman's psychiatric report.

¶ 60    By the time he was a teenager, Bonner had been abandoned by two different father figures: his biological father and his mother's long-term boyfriend James Weeden. The emotional hole left by their departure played a crucial role in the adolescent Bonner's search for other male role models, who included gang members and, ultimately, Abdul Aziz Rahim—a repeat violent felon who sold drugs and carried a loaded handgun around with him. Furthermore, Bonner spent his formative years going back and forth between his mother's home (where there were no rules and Bonner was regularly unsupervised while his mother worked) and his grandparents' home (where he was suddenly subject to strict, authoritarian discipline from his aunt and sister). Each change of home came with a change of school. The effects appeared as early as second grade, when the results of standardized testing showed that Bonner was lagging well behind his peers academically. As the years went on, his problems at school and at home only got worse, but, as Dr. Nierman pointed out, nobody in his life—not his family, his teachers, or even his aunt's well-meaning social-worker friend—were able to address his obvious emotional, behavioral, and academic issues. Dr.

Nierman's report explained how those problems reflected lagging neurological development and that each problem left unaddressed represented one more missed opportunity to promote Bonner's cognitive, emotional, and social development. As a result, when Bonner shot Mack on April 19, 2010, he had not "develop[ed] the neuropsychological pathways associated with normal development and self-regulation," leaving him even more emotionally immature, impulsive, and susceptible to negative influences than an ordinary 17½-year-old.

¶ 61    Rather than relying on Skinner's exhaustive recitation of the circumstances of Bonner's childhood and Dr. Nierman's uncontradicted opinion that those circumstances meant that his basic neurological needs were *not* met, leaving him developmentally behind his same-aged peers, the sentencing court emphasized Bonner's glib description of his childhood as "fair" and his family as "supportive." Bonner's subjective understanding of his circumstances was plainly at odds with what the unrebutted evidence showing what those circumstances were and how they contributed to his commission of the underlying murder. By endorsing Bonner's subjective understanding of his childhood, the court took an unreasonable view of the evidence. That was an abuse of discretion.

¶ 62    Third, we are unable to discern from the record why the court sentenced Bonner to 38 years' imprisonment despite finding that he was amenable to rehabilitation and not noting any specific factors in aggravation. That sentence is 18 years longer than the minimum, and it is only two years short of the line at which Illinois courts deem a term-of-years sentence as functionally indistinguishable from a life sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 40. The sentencing court, of course, does not need to set out its sentencing determination in exhaustive, painstaking detail. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 46 (explaining that the court does "not need to set forth every reason for its decision or specify the weight (or non-weight) given" to sentencing factors). But at the same time, appellate review of any discretionary determination is necessarily based on what the court said on the record about its decision. *Cf. Ortega*, 209 Ill. 2d at 360 (stating that a court making a discretionary decision must make "a record adequate to allow meaningful review of its exercise of discretion").

¶ 63 Here, as detailed above (*supra* ¶¶ 38-40), the court's remarks at sentencing focused on the youth-specific mitigating factors it was required to consider by statute. See 730 ILCS 5/5-4.5-105 (West 2022). We can safely assume that its sentencing determination was based, in some part, on its findings as to those mitigating factors, but what else did it consider? Beyond the youth-specific factors, the court did not specify any statutory aggravating or mitigating factors. See *id.* §§ 5-5-3.1, 5-5-3.2. Of course, it does not follow that the court did not consider anything else. See *Williams*, 2017 IL App (1st) 150795, ¶ 46. But it does signal that those other considerations were either so obvious as to not warrant comment or not significant enough to discuss on the record.

¶ 64 Although the court did not specify any factors in aggravation, we agree with the State that the evidence plainly showed two aggravating factors: (1) Bonner committed the offense with a gun, and (2) he fired the gun at a group of multiple people, threatening harm beyond the death of an individual victim. See *People v. Saldivar*, 113 Ill. 2d 256, 271 (1986) (holding that a sentencing court may properly consider "the force employed and the physical manner in which the victim's death was brought about" in aggravation). Those two facts were part and parcel of the evidence in this case, so we can presume that the sentencing court took them into consideration when determining what sentence would be appropriate. At the same time, the fact that the court did not mention either factor suggests that it did not place significant weight on either of them when arriving at its determination.

¶ 65 Against this limited aggravation, moreover, there was substantial evidence mitigating the severity of this particular offense relative to other first degree murders, and we must presume that the court considered that evidence as well. Whether or not Rahim pressured Bonner into committing the shooting, it is clear that he had a powerfully negative influence on the teenager's actions. At minimum, Rahim facilitated the commission of the offense by driving Bonner to Mack's house and making a gun available to him. See 730 ILCS 5/5-5-3.1(a)(5) (West 2022). The shooting was, under both sides' theories, an outgrowth of some kind of grudge between Rahim and the group of people in front of Mack's house—a crucial circumstance over which Bonner had no control and a consequence of Rahim's negative influence. See *id.* § 5-4.5-105(a)(2); *id.* § 5-4.5-

105(a)(5) (requiring the court to consider "the circumstances of the offense"). It is abundantly clear that Rahim's presence in Bonner's life arose from a confluence of circumstances over which Bonner had little or no control. See *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (recognizing that "juveniles have less control, or less experience with control, over their own environment"). Like the other drug dealers Bonner had fallen in with as a middle schooler, Rahim filled the void left in Bonner's life by the abandonment of his natural father and his *de facto* stepfather. See 730 ILCS 5/5-4.5-105(a)(3) (West 2022) (requiring the court to consider a juvenile defendant's "family, home environment, *** and social background, including any history of parental neglect *** or other childhood trauma"). Rahim's presence in Bonner's life, moreover, was a consequence of his sister Tyeisha, who encouraged Bonner to bond with Rahim, who was her boyfriend. See *id.* § 5-4.5-105(a)(2) (West 2022) (requiring court to consider whether a juvenile defendant "was subjected to outside pressure, including *** familial pressure).

¶ 66    Even more significantly, like the trial court, the sentencing court expressly found that Bonner could be rehabilitated. That finding rested on a strong evidentiary foundation. Bonner's age at the time of the offense "is itself a relevant mitigating factor of great weight." *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982). "The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). In other words, a youth's personality traits are "less fixed," which means that "a greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, 543 U.S. at 570. We have already noted that Dr. Nierman found that Bonner was, through his life circumstances, behind developmentally at the time that he committed this offense. But he also opined, without contradiction, that over the years since his arrest and incarceration, Bonner has started catching up developmentally. According to Dr. Nierman, "[t]he discipline, rules, behavior constraints, and limits on individual liberties in prison" effectively forced Bonner to do the mental exercise that, owing to his circumstances, he never did in childhood. Consequently, he has finally developed the "higher levels of cognition such as self-reflection and forethought" that were lacking when he shot and killed Mack as a teenager.

¶ 67 Bonner's youth at the time of the murder is not the only strong indicator of his rehabilitative potential. The record discloses that he had no prior convictions. See 730 ILCS 5/5-5-3.1(a)(5) (West 2022). His prison disciplinary record is not perfect—he received two citations for fighting in 2016 and four citations for nonviolent misconduct in 2018 and 2019—but, according to the unrebutted mitigation report, that is actually better than most young offenders given life sentences, who generally accumulate significant amounts of rule violations during their early years in prison. At both his original sentencing and at his resentencing, Bonner used allocution as an opportunity to apologize to Mack's family. See *id.* § 5-4.5-105(a)(9) (requiring court to consider "an expression of remorse, if appropriate").

¶ 68 Given the limited aggravation and the substantial evidence both mitigating the seriousness of the offense and demonstrating Bonner's capacity for rehabilitation, a 38-year sentence for an offense carrying a minimum sentence nearly half that length strikes us as one that, at best, is on the high end of reasonable sentences that might have been imposed on this particular offender for this particular offense. But the sentencing court in this case did not take the worst possible view of the evidence: it cited none of the limited aggravation and it acknowledged the substantial mitigation. Especially given the court's express finding that Bonner has rehabilitative potential, we do not understand why or how it concluded that the appropriate sentence was one that, if served in full, will keep Bonner in prison until he is 55½ years old. Put differently, given the evidence before the court at sentencing, what the court said about the evidence and what the court actually did when it came time to impose the sentence are so far apart that we are unable to conclude that the court exercised its discretion reasonably, not arbitrarily. To be clear, we are not finding that the 38-year sentence is beyond that which might be justified by the particular circumstances of this case. We hold only that it reflects a balance of aggravating and mitigating factors that is inconsistent with the sentencing court's on-the-record assessment of aggravating and mitigating factors.

¶ 69 In summary, the record shows that the sentencing court's assessment of two crucial points— Bonner's self-defense testimony and the nature of Bonner's childhood—were not reasonable views

to take in light of the evidence before the court at sentencing, and it also shows that the 38-year sentence selected by the court was at odds with what the court itself said about the evidence during the sentencing hearing. Based on those determinations, we hold that Bonner's sentence was the product of an abuse of discretion, requiring a new sentencing hearing.

¶ 70                                   III.  CONCLUSION

¶ 71        For the reasons stated, we hold that the resentencing court abused its discretion while sentencing Bonner. We therefore vacate the sentence and remand for a new sentencing hearing.

¶ 72        Sentence vacated; cause remanded.

¶ 73        JUSTICE ROCHFORD, concurring in part and dissenting in part:

¶ 74        I concur with the majority's analysis and rejection of Bonner's contention that upon resentencing he was improperly subjected to an increase in his "base sentence" from 25 to 38 years' imprisonment (*supra* ¶¶ 45-46). However, I respectfully dissent from the remainder of the majority's order finding that Bonner affirmatively showed that the sentencing court abused its discretion at resentencing.

¶ 75        On appeal, we accord great deference to a sentencing court's imposition of a sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). Absent some affirmative indication to the contrary, other than the sentence itself, we presume the sentencing court considered all aggravating and mitigating evidence before it. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. We will not substitute our judgment for that of the sentencing court simply because we would have balanced the appropriate sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010).

¶ 76       Here, the trial court found Bonner guilty of first degree murder while personally discharging a firearm and in so doing the court rejected Bonner's claim of self-defense. On direct appeal, Bonner did not challenge his first degree murder conviction as against the evidence. We vacated his 50-year sentence after finding the trial court had considered in aggravation that Bonner "had caused a death," an improper sentencing factor as it was an element of the crime. *People v. Bonner*, 2019 IL App (1st) 151097-UB.

¶ 77       The resentencing court imposed a sentence of 38 years, a sentence which was 12 years less than the original sentence and well within the statutory range of 20 to 60 years in prison for a first degree murder conviction. 730 ILCS 5/5-4.5-20(a) (West 2022). Additionally, the court did not impose the available 25-year-or-longer sentencing enhancement for Bonner's use of a firearm in the commission of the murder. 730 ILCS 5/5-4.5-105(b), 5-8-1(a)(1)(d)(iii) (West 2022). Bonner is also eligible for parole review, which may be considered in a determination as to whether a sentence is excessive. *People v. Anderson*, 2024 IL App (1st) 220864, ¶ 28. Given that this sentence was well within the statutory range, we must presume his sentence was proper absent some indication otherwise. See *People v. Burton*, 2015 IL App (1st) 131600, ¶¶ 36, 38 (A defendant "must make an affirmative showing that the sentencing court did not consider the relevant factors."). On the record before us, I would conclude that Bonner has made no such affirmative showing. Rather, the record reflects that the resentencing court properly exercised its discretion in applying the relevant factors in mitigation and aggravation.

¶ 78       The majority concludes otherwise. In vacating the sentence, the majority first maintains that the resentencing court unreasonably "assessed" the self-defense evidence in relation to the State's "theory" at trial. When reviewing the statutory factors and referring to the factor of "[w]hether the person was subject to outside pressure including peer pressure, family pressure, or negative influence," the resentencing court said "I did review the Defendant's social history and family situation. I also considered though that the Defendant indicated that he did not feel outside pressure to actually do the shooting for which he was convicted of. He continues to claim self-defense at the time of trial and even until today." The majority believes these statements show that the

resentencing court did not give Bonner's self-defense testimony any mitigating weight, but instead used the self-defense claim to undermine any mitigation associated with any pressure Bonner may have felt from Rahim to commit the murder. The resentencing court, however, made no declaration that it was disregarding the mitigation factor relating to pressure, but rather highlighted Bonner's own testimony that he did not actually feel outside pressure to actually do the shooting. The court was simply weighing all the evidence of this factor. In any case, an appellate court "must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently." *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 79　　　　The majority also finds fault with the resentencing court referring to and relying upon Bonner's own description of his childhood as fair and his family as supportive, as set forth in the PSI. At the outset of the hearing, however, Bonner corrected several elements of the PSI but did not seek to correct these specific statements. The majority concludes that by referring to these statements the resentencing court must have ignored the contrary mitigation evidence presented by Skinner and Nierman as to their assessment of Bonner's background. This appears to be an improper attempt to reweigh the mitigating evidence on appeal. Here, the resentencing court stated that it had considered all the evidence in mitigation, and again we must presume that the court properly considered and weighed all evidence of mitigating factors unless Bonner affirmatively shows the contrary. *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 44. Moreover, where a court has considered the relevant mitigating factors, we may not substitute our judgment merely because we may have weighed them differently. *People v. Clark*, 2024 IL 127838, ¶ 76.

¶ 80　　　　Next, the majority contends that the resentencing court did not specifically discuss the factors in aggravation and concludes that the evidence in aggravation here is limited to the nature of the crime. However, in reviewing whether a sentencing court properly applied the factors in mitigation and aggravation, a reviewing court does not focus on isolated statements but rather considers the record as a whole. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). The sentencing court need not articulate each and every factor that was considered in crafting a sentence. *People v Villalobos*,

2020 IL App (1st) 17112161, ¶ 74. And even if a factor was not specifically mentioned, we cannot conclude that the court did not "take all of the important and relevant factors into account." *Id.*

¶ 81    Finally, the majority describes the "limited" aggravation to be Bonner's use of a firearm to commit the murder and that he fired the gun into a group of people. The majority concludes that with the aggravation being limited and with the mitigation evidence and the rehabilitative potential being substantial, Bonner's sentence is, at "best, at the high end of *reasonable* sentences that could be imposed" (emphasis added). Thus, the majority appears to recognize Bonner's sentence was reasonable but nevertheless concludes that a lower sentence would be more appropriate. Again, as the reviewing court, we may disagree with the length of a sentence but we cannot reverse by substituting our weighing of the factors for that of the resentencing court. *Clark*, 2024 IL 127838, ¶ 76. Furthermore, the seriousness of the offense is considered the most important factor even when sentencing juvenile offenders. *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 99. Furthermore, "[t]o whatever extent defendant displayed rehabilitation potential, a defendant's rehabilitative potential is not entitled to more weight than the seriousness of the offense." *People v Hill*, 2022 IL App (2d) 2000416, ¶ 55 (where court upheld 40 year resentence for defendant who was 17 years old at time of first degree murder).

¶ 82    In the end, the majority attempts to isolate comments that the resentencing court did make, and speculate as to specific comments that the court did not make, only to conclude that the record therefore "reflects a balance of aggravating and mitigating factors that is inconsistent with the sentencing court's on-the-record assessment of aggravating and mitigating factors" (*supra* ¶ 68). This analysis fails to comport with the relevant standards applicable to appellate review of a sentence, and fails to recognize both that a sentencing court need not articulate each factor that was considered in crafting a sentence and that we may not substitute our judgment for the sentencing court merely because we may have weighed the evidence and sentencing factors differently.

¶ 83    For the above reasons, I respectfully dissent from that portion of the majority's order finding that Bonner affirmatively showed that the sentencing court abused its discretion at resentencing.